Two badgers. Eight two badgers. Good, three eight batters. Mary S. Nepomuk, north of Tom Marks. Thank you very much. From Kent State Bank, now-known as Forrest, Forest and State Bank is a construction co-operator of dependents and attlives. Arthur and Long Beth have two plaintiffs-appounts. This is John A. DeSignore. Arthur and Long Beth are dependants and athlives at Heisler Construction. This is Chantal R. Chchestz Arthur and Long Beth are dependents and athletes at Kent Bank. This is Samantha J. Johnson. This is Ricardo. Please speak loudly so the recording device picks up your voice and pay attention to the time signal. If we require additional time, we will so indicate. Your Honor, thank you. Good morning. As the clerk informed you, my name is John Gazzardo and I represent the plaintiffs, Jeff Martin and Mary Martin. This appeal seeks reversal of summary judgments entered in favor of defendants Kent Bank and Heisler Construction. Plaintiff's case is based on circumstantial evidence, which is undisputed and uncontradicted by defendants. The only real dispute is what logical inferences can reasonably be drawn from the undisputed circumstantial evidence. This appeal involves the inherent tug-of-war between what is a logical and reasonable inference to be drawn from undisputed evidence. So circumstantial evidence is, you understand the definition of circumstantial evidence, right? It's proof of one fact that leads to a reasonable inference of another fact, correct? Yes, sir. And in your brief, you cite Hornacek. Yes. Isn't Hornacek quite different from the facts of this case? Factually, it is different, Your Honor. I mean, in Hornacek, several witnesses testified about an ice flow, high snow piles that had been pushed up against the building, the connection between that ice flow, those ice piles into the area where the victim slipped or plaintiff slipped and fell. How is that relevant here where here we have an isolated patch? I think Hornacek is important for this appeal, despite the factual differences, because it stands for the proposition that a plaintiff in this type of case can rely on the reasonable inferences arising from the circumstantial evidence. I acknowledge the factual differences. How do we distinguish between a reasonable inference and speculation? I mean, when you have witness testimony like we did in Hornacek, that's one thing. Maybe that isn't speculation. But here, we don't have the same kind of testimony. That is true. So why is it not speculation in this case? The nexus, that is. We're talking about establishing the nexus. Right. I submit that because we are considering the grant of summary judgment, that the proper focus on appeal is a de novo review of the totality of the evidence, not simply a specific part of the circumstantial evidence. And as I believe I will point out, and I hope I did in my brief, that it's the totality of the evidence here, when viewed in its light most favorable to the plaintiffs, that cumulatively allows for a reasonable inference about an unnatural accumulation. Well, do we have any evidence, and this would be from the pavement, and I believe Mr. Martin took some pictures at some point in time that might have been offered to the court. Is there any evidence of a water trail, whether it's ice or just staining the pavement, from those ice piles or those snow piles to where this accident occurred? If I had that evidence, I might not be here today. But I would point out that the bank's employee, Alicia Schofield, talked about the surface of the parking lot generally being wet. And even though this fact wasn't highlighted in the briefs, I don't believe, that the testimony of Robert Heaster was that merely two days before Mary Martin fell, he had spread salt and ice melt on the parking lot. Those two facts, coupled with the weather records showing a fluctuation of above and below freezing temperatures, and no record of any natural precipitation having fallen, I think from all of that one could reasonably infer that there was snow melting from the piles shown in the photographs, causing the surface of the parking lot to be wet. But that pile was several feet away from where this isolated two-by-two-foot patch was, correct? That is correct. And the judge speculated that perhaps your client, when she parked in the same location the day before, that it could have been snow falling off of her vehicle that created and melted, creating an ice patch, as opposed to somebody else. Yes, he did. And that would be speculation, right? That's speculation? Yes. Well, how is that speculation, but your theory is not speculation? That theory has just as much plausibility as your theory. I mean absolutely no disrespect to Jeff Shores. He did speculate. I am puzzled by his comments leading up to his ruling on the motions. However, I believe that the inference that the patch of ice only a few feet away from a snow pile that extended over the curb of the parking lot is more than speculation. It is a reasonable inference in the context of all the evidence, whereas Judge Shores' remarks strike me as speculation. Where is the evidence that defendants had actual or constructive notice of this condition? Well, first of all, with respect to heister construction, the plaintiffs need not show actual or constructive notice because heister construction was responsible for the snow piles and for spreading ice and generally maintaining the lot. So under the law, we don't have to show notice. The actual or constructive notice on the part of Kent Bank comes from, again, a look at the totality of the evidence. The bank management were intimately involved in the design and construction of this parking lot and particularly the landscaping, which is a raised berm above the surface of the parking lot on top of which the snow was piled. They're at the bank every day. The vice president, Jolene Bonsack, justified that she's in charge of the snow removal contract and she has the right to direct where the snow is piled or have it hauled away. They were there every day. I respectfully suggest that that gives them constructive notice of what's going on with those piles of snow along the edge of their parking lot. With regard to constructive notice in Hornacek, you had prior complaints of people slipping. Correct. There was no evidence in here of prior complaints of people slipping on ice or snow in the parking lot, correct? Correct. In fact, your client saw this particular spot as her spot. Maybe it had bank employees, but she was there doing examining, so she wasn't an actual employee of the bank, correct? Correct. But this parking space, which was relatively close as it sounds, was hers, and she was in it the day before. She didn't even have any complaints about the day before, did she? I don't believe so, no. With respect to your argument concerning design or design of the parking lot or the way the parking lot and the mounds were configured, doesn't the absence of any ISO from those mounds to the patch where your client fell tend to rebut an inference that there was defective design? I mean, isn't the opposite of what you just argued true? The way I would answer that is I think there is at least some circumstantial evidence of a flow of water. Given the testimony of the bank's employee that the parking lot surface was wet, I agree. I don't have evidence, as in some of the cases in the briefs, eyewitness testimony of melting snow. But I don't believe in this case that it's absolutely clear that there was no ice or snow melt onto the surface. And the particular snow pile in front of my client's car extended over the curve as shown in the photographs onto the surface of the parking lot. So I think it's reasonable to infer that if and when that snow melts, it's going to end up on the surface of the parking lot right in the parking space where Mary Martin parked and a few feet from where she fell. Do we know how much snow there had been in the days preceding? I don't know off the top of my head. It's probably in the medical records. But I think the testimony is that there hadn't been any precipitation for a couple of days at least, for I think a week maybe. Now, you argue that, or you indicate that you believe that Crane and Medeo are distinguishable, and yet if we look at the facts of those cases, it seems to me they're pretty similar. I mean, the defendant in Crane had plowed the snow into a pile adjacent to where the plaintiff parked her car, and it was she who claimed that she was 99.9% sure that she slipped on a patch of ice that formed when the snow melted and then collected again overnight. You know, the weather was a factor there too. And similar in Medeo, the victim's daughter also testified similarly as to a pile of snow that melted in the weather. I mean, what do you find distinguishable about those two cases, and why aren't they important for us to look at and follow here? The rule from Crane and Medeo applies here. But I don't think that it controls to the extent that the summary judgments in this case must be affirmed. In Crane, I think the factual differences are stark. There was recent precipitation, rain two nights before, snow the night before. The plaintiff testified herself that the surface of the parking lot the day before she slipped and fell had numerous areas of packed snow and puddled water. I think that's dramatically different than what we have in this case. In Medeo, as best we can tell from the opinion, the ice patch on which the plaintiff fell is at the farthest point of the parking lot away from the snow pile. That's starkly different than what we have in the present case, which is a patch of ice confirmed by the bank employee just a few feet from the snow pile. I believe that this case is very similar to Russell v. Village of Lake Villa, which was decided by this court in December 2002. In Russell, as here, the plaintiff relied on a logical inference that the ice on which he fell came from melting snow from a nearby snow pile. There was a difference, factually. In Russell, according to the opinion, the ice was kind of described as an apron around the snow pile, and the defense here argues that that makes it inapplicable to this case. I respectfully suggest that in the context of all the evidence in this case, whether the ice patch was a few feet from the snow pile or contiguous to the snow pile is really not significant, particularly because in both cases there were no eyewitness testimony about the snow pile melting and re-freezing. There was no evidence of recent precipitation. In both cases, the ice on which the plaintiff fell was described as clear. And in both cases, there was no dispute that the ice on which the plaintiff fell was the proximate cause of the plaintiff's injuries. This court's opinion in Russell cited Grove v. Hollywood Casino, which I think is important to this case, because the Russell court cited Grove for the proposition that if fair-minded people can draw different inferences from undisputed facts, then summary judgment shouldn't be granted. And that is, I submit, really what we have in this case, different inferences arising from undisputed facts. How warm was it getting during the day during this period of time, according to the weather information? It was above freezing, correct? It was above freezing and sunny. But then it would get down to about freezing or just slightly less than, you know, into the upper 20s at night, correct? That is my recollection, yes. Well, and this is a concrete, I believe, parking lot? I believe it's asphalt with a concrete curb around it. Okay. Either way, both, it's, you know, I think it's common experience that both asphalt and concrete, although I think concrete more significantly, perspire or sweat when it gets warmer, and then it goes, you know, the temperature goes down. Is there any evidence that that's why the parking lot looked damp, as I think one of the employees had said? There's no evidence in this case. My time is up, Your Honors. I believe Russell is particularly applicable. The Russell court reversed the trial court summary judgment. I believe that's what should be done in this case. We do have time for rebuttal. Thank you. Thank you. Ms. Velazquez. Good morning. Good morning. May I please have the court? Counsel? Could you pull the microphone down just a bit? Oh, sure. Thank you. Of course. Even with my heels on, I'm a little short. So, my name is Chantel Velazquez. I'm with Cicero, Prince, and Alexander in Rockford, and I'm here on behalf of Heaster Construction, who, as the court is well aware, is the snowplow contractor in the case at issue. We were the snowplow contractor on the day of the accident, prior thereto, and since, and that's what the evidence has shown. It's undisputed. I'm here today, of course, requesting that the summary judgment that was granted by Judge Shorshaw of the 15th District, or of the 15th Circuit, is affirmed. And because I only have seven and a half minutes, I think what I'm going to do first is address some of the issues that were raised by Your Honors with Mr. Gazzardo, and start with that rather than... How about starting with Russell v. Village of Williamson? That would be fine. I would be happy to do that. So, the crux of plaintiff's argument here, of course, is that there is a sloped lot, that there has been snow piled along portions of the perimeter, in this case, specifically the west and the north side of the lot, and that there was fluctuating temperatures. And those things should lead the court to reverse the summary judgment motion, that those things lead to a reasonable inference that the ice that Ms. Martin slipped and fell on was because of those factors, cumulatively. So, circumstantial evidence, as plaintiff has admitted time and time again, this court has specifically said that circumstantial evidence, cases in slip and falls with circumstantial evidence, that you also are required to present an expert in terms of testimony. Specifically, as to Russell, this was where the plaintiff in that case was... In that case, this court, of course, reversed the trial court, saying that, look, there was testimony that there was a contiguous apron of ice at the base of the snow pile. And so, there was also photos, in that case, of a mound of snow that had been piled over the handicapped curbs. Plus, and this is critical, the plaintiff was on the ice that was connected to the snow pile, and even more, potentially more critically, and what we don't have here, besides the contiguousness of the ice and the snow, is that the village director of public works, who would be the representative of the defendant in that case, agreed that the ice seemed to have formed or could have formed from those piles. So, not only do we have a snow pile with a contiguous apron of ice on which the plaintiff was seated, but we have testimony from both sides saying, yes, that was possible that that ice came from that snow pile. We do not have that here. Yes, there was fluctuating temperatures in the Russell case, but this court, in reversing the trial, the trial judge said, look, there was an identifiable direct link between the ice on which the plaintiff fell and the snow piles that were there. So, those are the critical differences. And so, plaintiff in this case has continued to rely on both Russell and Hornachek, as the court has pointed out, but the difference is, is that both of those cases had direct evidence of this causal link. And so, I know that plaintiff has said time and time again that, you know, if I did have this direct link, possibly I wouldn't be here. But that is exactly what, Your Honors, this court has held is required in a case absent some expert testimony supporting the otherwise circumstantial evidence. Well, the direct link, however you agree, can be shown by circumstantial evidence, correct? Yes. And I think, obviously, what he's saying is the circumstantial evidence is the weather factors that he articulated and told about and the snow piles that were made by your client. Right. That were close to the place where her car was parked and she fell. And I don't disagree with that sentiment, but for the cases coming out of this court have said that there's got to be that direct link. And in the cases where, that we've relied upon, those cases have actually had more evidence I would submit on behalf of HESTER than what we have in this case. And the court here has said, though, that is not enough. That is not enough. Crane was very similar, but for the fact that it was on a gravel parking lot. Same situation as our case where neither plaintiff saw the ice before they fell. The snow pile contractor had last been out some eight days before. In our case, we know that the last time Mr. HESTER plowed the lot was March 5th. And this fall occurred on the 14th. He had been out intermittently in between to put down some additional salt and ice melt. But on the day that the plaintiff fell in Crane, or the day before, I'm sorry, she saw areas of snow and water, but she did not observe ice. Same with Mrs. Martin. There was evidence of fluctuating temperatures. Same as in the case here, which I would submit to your honors doesn't take climate or meteorological, I can't even spit the word out, weather evidence to prove. I mean, we live in northern Illinois. It's March. Of course, the temperatures are fluctuating. They're getting warmer and then colder again at night. And in the Crane case, she said, the plaintiff said, I'm 99.99% sure that that ice that I fell in came from those snow piles. And your honor, this court said not enough. That is not enough evidence. We need some direct requisite. You haven't proved the requisite nexus between piles on the periphery of the lot and where the plaintiff fell. So I think that the case law is very clear that if you, that it requires something more than what we have here. You've got to have that direct link. You've got to have that causal nexus. Alternatively, you can come forth with an expert that says, there's something about this lot that would lead ice to form in the spot that the plaintiff fell if the snow pile contractor piled the snow here. We don't have either of those things. And so plaintiff has said time and time again, and I'll do respect to Mr. Gazzardo, that no notice is required to he's due because it was responsible for the snow piles. So I just want to submit to your honors, to the extent that that argues that somehow his lack of action or his lack of being out there and monitoring those piles on a day-to-day or minute-by-minute basis somehow gives rise to a duty here, that that is not an accurate statement of the duty. In the cases that we relied upon, and I think that even the cases that Mr. Gazzardo has relied upon, the duty is clear. A snow pile contractor's duty is only to not negligently cause or aggravate an unnatural condition. Here, I would submit to your honors that we don't even have proof that this is an unnatural accumulation to begin with, and we certainly do not have evidence that Mr. Heaster was negligent in his plumbing duties. Are the piles unnatural accumulations? Yes, I would 100% agree with that, and I don't think that that's in dispute, if I might finish my thought. Where else could the water have come from? Well, I think as the trial court opined, there are other things speculated. As your honor pointed out, it could have come off of the car. It could have come off of one of the examples that came up at the trial court level, and I know I'm out of time, so I'll speak quickly, is if somebody had spilled overnight in the parking lot. Somebody came along, even one of the bank employees, let's say, got out of her car that morning and spilled her coffee as she was carrying into work. Again, pure speculation because we don't have an identifiable link relating that scenario or the scenario with the car or the scenario with Mr. Heaster to the ice on which she fell. And without that or an expert giving some additional credence to Mr. Gisardo's theory, it's not enough. And we would respectfully ask that your honors affirm the judgment of the trial court. Thank you. Thank you. Ms. Jolci. Thank you. Good morning. Almost afternoon. May it please the court. Counsel. My name is Samantha Yosey, and I'm here on behalf of Kent Bank, which is now known as Forreston State Bank, the property owner in this situation, as the court is aware. I would like to address some of the issues that Mr. Gisardo raised with respect to my client, specifically as the landowner. As the court is aware, plaintiff has made several allegations regarding the design of the parking lot. And plaintiff's briefing in this case has demonstrated that plaintiff believes that the landowner, in this case Kent Bank, is responsible for the ice patch because of involvement in design of the parking lot and that the parking lot itself was sloped. Defendant certainly does not dispute that the parking lot was sloped in this manner, and the bank employees were involved in various design aspects when they were remodeling the parking lot, which is undisputed in this case. However, plaintiff has not demonstrated sufficient evidence in order to meet that burden with respect to the applicable case law. And per the ruling in Crane, in order to show that a slope in a parking lot has resulted in a defective condition, plaintiff would have to show that the slope itself is of a dangerous nature and then that the dangerous nature of that slope actually caused or led to the alleged defective condition, which in this case would be the ice patch on which plaintiff slipped. Is there a ground drain in this parking lot that it's sloping to, or is it just sloping to the other end? There is a drain in the parking lot, and it's sloping to the other end. I believe it's going northwest to southeast, and there is a drain in the parking lot, which, of course, is prudent from a designer's perspective. My clients, of course, are not sophisticated property designers or engineers, and I would actually compare that to one of the cases that was cited by a plaintiff, which is the Stroyette case in which there was a woman who was working for a pie-making company, and she fell on a pretty deep grade of a sloped sidewalk. I think it was 13.6 percent grade, and the court actually imputed knowledge of the defendant landowner company of the dangerous nature of that grade because they had staff engineers. They were such a big company that they had engineers that were hired and employees of the company, so the court actually imputed knowledge on the defendant, saying, Well, you have engineers that are working for you. You should know that a 13.6 percent grade on the sidewalk is a defective condition. That's not the type of situation that we have here. Although my clients were involved in the certain design aspects, they weren't actually designing the parking lot, and they aren't of an engineering background. Of course, these people are bankers and bank clerks, so they don't have that same type of knowledge. And above all, plaintiff has not offered any expert testimony of the nature of this slope. Ms. Bonsack said that she's kind of the property manager, and she was there during the construction of this parking lot, and she looked at it on a regular basis. Is there any evidence in this record that she ever redirected anyone during construction or asked questions relating to the construction? To my knowledge, there's not. That was never really asked of her in her deposition, but it was my understanding that that's not the extent of her involvement. It was more just from the bank. There needed to be someone as essentially a point person with the people that were on site and involved in the redevelopment. You mentioned there's no expert testimony or adaptability from an expert, suggesting that the design created the high patch or the defect here. Correct. There's no expert testimony in that regard. And for the facts of this case, plaintiff would have had to provide some type of expert testimony in order to connect a sloping parking lot with a defective condition. Simply having a sloping parking lot is, of course, not negligent, and it needs to be demonstrated that there's actually a dangerous nature of the slope that we have here, and no one here knows what the slope of the parking lot is because there was no expert that ever went out to measure that. So plaintiff simply stating that we have a sloping parking lot, which, of course, is not disputed, but there's no connection to a dangerous condition. And even one step further, there's certainly no connection between a sloping parking lot and that particular ice patch. Plaintiff would have to then, once demonstrating that the slope itself is dangerous, plaintiff would have to then go one step further and demonstrate that that particular slope actually led to the ice patch on which she slipped, and we, of course, don't have any of that evidence in this case. So in terms of holding my client responsible from the perspective of being the landowner, plaintiff has fallen significantly short of her burden with respect to showing that there was some type of design issue with the parking lot that led to this injury. If somebody, a witness who visited the parking lot periodically, or a bank employee who was looking out the window happened to see a flow of water going to that drain, not necessarily to the location of the ice patch, but going to that drain, would that have some impact on this particular issue? I think that could potentially have an impact on the issue. The parking lot is, and again, I'm not speaking, of course, from the position of an engineer, and we don't have any evidence like that in this case, but common sense would tell you that any type of a slope in a parking lot towards a drain is designed to help that parking lot drain the water on its surface so that issues like this wouldn't happen. So I would argue that if there had been testimony to that effect, that there's water leading from one place to the other, and there happened to still be an ice patch where plaintiff fell, then I think plaintiff would need an expert to show that there's some type of depression in the parking lot. A defect that would hold the water as opposed to letting it move. Exactly. Because if there's an ice patch where her vehicle is that's in the middle of the ice flow to the drain, then that, to me, would seem like more of a defect. But plaintiff, again, would need some type of expert testimony or at the very least some type of measurement to show that that depression is a defect in terms of the way the slope was supposed to be designed. We might commonly call it a pothole. Right. Which I'm very familiar with. Okay. And I think, I know I'm almost out of time, but I think that's the crux of the issue with respect to my client as the landowner. And, again, I'll just emphasize that there's no notice with respect to my client, similar to as Counsel for Hyster has already argued, that applies to my client as well. There's never been any complaints that were given to the bank. And as Your Honors have indicated earlier, even plaintiff herself who parked there the day before never complained to my client that there was ice throughout the parking lot or anything of that nature. So there simply is no evidence of notice with respect to my client, which again is in stark contrast to the Hornishat case where there's multiple people that had complained of the issues with the ice. I have one question. Go ahead. Well, I had one question, and it just flew out of my head. Oh, I know. Do we have any information about why Hyster came a couple days earlier to put down ice melt? Do we know if that was at the bank's request or he was just going by checking properties and he decided to do that? I believe he was just checking properties. I don't think that was at the bank's request. Okay. Now I think I know. Okay, thank you very much. Again, we just ask that the decision of the trial court be affirmed. Thank you. Mr. Guzzardo. Thank you. I just have a couple points to make. I will be brief. The focus today in regard to Kent Bank has been on the allegations related to design and construction, but the amended complaint has other allegations which can give rise to Kent Bank's liability. Paragraph 6 of the amended complaint, subparagraph 8, failing to exercise ordinary care through its agents and employees to remove snow and ice and other precipitation from the parking lot. Aren't those conclusions, though, as opposed to factual allegations? I mean, in order to prove constructive notice, you must show that the hazardous condition existed for a sufficient amount of time or that through the exercise of reasonable care, the defendant should have discovered the dangerous condition, correct? Correct. I've heard it said that one person's conclusion is another person's allegation of fact, and I'm not trying to be flippant. I understand. I mean, you're doing the very best with what you have. Right. Also, it's alleged that the bank, and this was touched on earlier, that the bank failed to properly supervise the removal of snow and ice, and Vice President Bonsack had the ability to have snow hauled away. With regard to notice of a or permitting a hazardous condition to exist on the premises, I submit that the raised berm that was created around the parking lot is the worst place to pile snow, yet it was always piled there by heister construction with the acquiescence of the bank. So I think failing to properly pay attention to that and to order the removal of the snow could be a basis for liability here. How do you respond to the bank's argument that without the nexus, without a connection between this ice patch and snow mounds, you needed an expert? I confess ignorance as to which case counsel is referring to. I recall from Russell in particular that there was no expert. Oh, you have concessions in Russell. True. You don't have concessions here. That is true. I'm also aware of case-wise- I should say admissions, not concessions. Admissions. Admissions, right. I'm sorry I'm drawing a blank on the specific case captions, but I believe in the appellant's brief there is case law that says some of these issues are common knowledge, that snow thaws and refreezes and water drains downhill and other things like that. So I'm not in a position to concede counsel's argument that expert testimony is needed in this case. I'm sorry, I can't be more exact than that. Well, I think that the issue might be since we don't have that picture that you wished you had of a line of water or a stain on the pavement going to that little patch that caused the problem, but you do have this snow pile around, and you have a drain somewhere located probably in the middle or three-quarters of the way through the parking lot, somebody's got to be there to say how that water got there. And that would have to, if it hasn't been noticed by anyone, that probably is what an expert would have to tell us. How did that water get there? You're assuming that it melted and ran there, but we don't even know that that's, from what I've seen so far, that's the actual slope that is taken. The slope may be a few degrees to the south, a few degrees to the north, and could this, that spot, fall together. I believe that there is testimony from either Jeff Williams or Jolene Bomsack and Kent Bank in regard to the way that the, where the drain was placed in the lot and generally the way the surface of the lot was graded, that it is intended to drain generally from the north and west to the southeast where the drain is located, and I believe one of them said it drains as it's supposed to. Now, that's not a direct answer to your question, but this spot where Mary Martin fell was to the west and a little bit north of where the drain was located. And it was essentially the same area that she had stepped on the day before when she got out of the vehicle. It was true, yes. And, you know, the point is, I think, and you've acknowledged this, that you certainly don't have to prove your case in summary judgment, but you do have to provide sufficient factual evidence to support reasonable inferences. Yes, and I respectfully suggest we've done that. These cases rarely have the type of perfect direct evidence that we would all like, and I would only say that the Crane and Medeo cases, when they talk about a causal link or a direct link, I don't believe those opinions should be read as requiring an actual physical connection between a snow pile and a patch of ice. Thank you for your consideration. Thank both parties for their arguments today. A written decision will be issued in due course. The Court stands in recess until the next case is called. Thank you.